2016 PA Super 183

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| GLAVIN JUSTAN IVY, | |
| Appellee | No. 1485 WDA 2015 |

Appeal from the Order Entered September 10, 2015
In the Court of Common Pleas of Mercer County
Criminal Division at No(s): CP-43-CR-0001780-2014

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| GLAVIN JUSTAN IVY, | |
| Appellant | No. 1575 WDA 2015 |

Appeal from the Order Entered September 10, 2015
In the Court of Common Pleas of Mercer County
Criminal Division at No(s): CP-43-CR-0001780-2014

BEFORE:  GANTMAN, P.J., SHOGAN and LAZARUS, JJ.

OPINION BY SHOGAN, J.:                    **FILED AUGUST 19, 2016**

Appellant, the Commonwealth of Pennsylvania, appeals from the September 10, 2015 pretrial order precluding the admission of evidence in

J-S37023-16

the impending trial of Appellee, Glavin Justan Ivy, who has filed a cross appeal.[1]  The order appealed granted in part and denied in part the Commonwealth's motion *in limine* seeking to introduce prior bad acts of Appellee pursuant to Pa.R.E. 404(b).[2]  Following our careful review and for the reasons that follow, we reverse in part and remand.  We quash Appellee's cross-appeal.

In its opinion pursuant to Pa.R.A.P. 1925(a) ("Rule 1925 Opinion"), the trial court summarized the facts and procedural history of the case as follows:

> Glavin Justan Ivy (["Appellee"]) has been charged with Rape, 18 Pa.C.S. § 3121(a)(1), Kidnapping, 18 Pa.C.S. § 2901(a)(3), and Aggravated Assault, 18 Pa.C.S. § 2702(a)(1) for an alleged violent sexual assault incident that occurred

_____

[1]  The Commonwealth filed the initial appeal, and Appellee filed a cross appeal.  On November 19, 2015, this Court, *sua sponte*, consolidated the appeals and directed the parties to proceed in accordance with Pa.R.A.P. 2136.  For ease of disposition, we reference the Commonwealth as the appellant and the defendant as Appellee.

[2]  The Commonwealth may appeal an interlocutory order precluding evidence when it provides a certification with its notice of appeal that the order terminates or substantially handicaps its prosecution. **Commonwealth v. Whitlock**, 69 A.3d 635, 636 n.2 (Pa. Super. 2013) (citing Pa.R.A.P. 311(d)).  Moreover, the Commonwealth may appeal the grant of a defense motion *in limine* which excludes Commonwealth evidence and has the effect of substantially handicapping the prosecution. **Commonwealth v. Gordon**, 673 A.2d 866 (Pa. Super. 1996).  Here, the trial court ruling excluded Commonwealth evidence, and the Commonwealth has certified that the rulings' effect substantially handicaps the prosecution. Thus, the appeal is properly before this Court. **Commonwealth v. Belani**, 101 A.3d 1156, 1157 n.1 (Pa. Super. 2014).

- 2 -

November 18, 2014 through November 19, 2014. The victim in this incident is [A.C.], age 30.

On November 19, 2014, [A.C.] reported to the Sharon Police Department that she had met [Appellee] online using a dating service called "Plenty of Fish" approximately one month prior, at the end of October, 2014. The two of them began a relationship via texting, and [A.C.] and [Appellee] first met in person at [Appellee's] apartment on November 7, 2014. After that date, [A.C.] and [Appellee] continued to spend their weekends together at [Appellee's] apartment.

On November 18, [2014, A.C.] received a number of messages via Facebook Instant Messenger[3] wherein [Appellee] "dumped" [A.C.] because [Appellee] believe[d A.C.] lied about when she had last seen another male. Throughout the messages, [Appellee] calls [A.C.] a variety of derogatory names and expresses his hopes that she kills herself in a myriad of ways. [Appellee] also compares [A.C.] to his ex-girlfriend, [C.D.], by saying that they are "sooo alike" and "they are the same." Throughout these messages, [A.C.] continually apologizes for making [Appellee] upset, expresses her love for [Appellee], and pleads to still be able to see him. Ultimately, [A.C.] messages that she would like to go to [Appellee's] apartment to collect the pillow she left there.

[A.C.] arrived at [Appellee's] apartment at approximately 6:42 p.m., and [Appellee] simply opened the apartment door, threw the pillow out to [A.C.], and then shut the door. As [A.C.] walked away, [Appellee] then re-opened the apartment door, held out his arms as if indicating that he wanted a hug, and asked [A.C.] to come upstairs to his bedroom. Once in the bedroom, [Appellee] began questioning [A.C.] about all of her previous sexual partners. [Appellee] also began calling her a "stupid bitch," among other names.

---

[3] Instant Messenger "refers to a type of Internet service that enables users to engage in real-time dialogue 'by typing messages to one another that appear almost immediately on the others' computer screens.'" **Commonwealth v. Reed**, 9 A.3d 1138, 1140 n.2 (Pa. 2010) (citing **United States v. Meek**, 366 F.3d 705, 709 n.1 (9th Cir. 2004)).

At one point, [Appellee] motioned as if to kick [A.C.]; [A.C.] dodged and attempted to get out of the room through the bedroom door. [Appellee] blocked her access to the door and told her that she was not going to leave. [Appellee] then pushed [A.C.] onto the bed with the palm of his hand and told her to sit against the wall, which she did. [Appellee], while still calling her names, then struck [A.C.] on the right side of the face using the back of his hand. He did so with enough force to turn her head and cause the left side of her face to strike part of the window. [Appellee] then backhanded her again in the nose. [Appellee] then grabbed [A.C.] by the throat with such force that he was able to pick her torso up off of the bed. [A.C.] was unable to breathe and could not remember if she lost consciousness, although she could recall begging [Appellee] to stop, but stated it was very hard to talk. [Appellee's] use of force caused bruising on [A.C.'s] neck.

When [Appellee] let [A.C.] go, he grabbed her hair with both hands and started to pull her hair. [A.C.] began to cry, which in turn made [Appellee] cry. He then began hugging [A.C.], saying[,] "you broke my heart, so I had to teach you a lesson not to lie to me again." [A.C.] told [Appellee] several additional times that she wanted to leave. [Appellee] refused these requests, and [A.C.] again attempted to leave at one point, but [Appellee] jumped in front of the door and would not let her pass. For an unknown period of time, [Appellee] and [A.C.] laid in [Appellee] bed talking, and [Appellee] asked [A.C.] if she wanted to have sex. [A.C.] agreed to have sex, but only did so because she was afraid [Appellee] would assault her again or force himself on her if she refused. Afterwards, [A.C.] was permitted to use the restroom, but [Appellee] accompanied her the entire time.

Ultimately, [Appellee] agreed to let [A.C.] leave at approximately 3:00 a.m. on November 19[, 2014,] so that she could go to work. Later that day, after [A.C.] discontinued all messaging with [Appellee, Appellee] messaged her on Facebook stating that he had recorded them having sex using his cellular phone and threatened to send the recording to everyone they knew. [A.C.] reported to police late on November 19[, 2014,] everything that happened. On November 20, [2014, Appellee] was taken into custody by Sharon police officers. [Appellee] was Mirandized, waived his Miranda rights, and made a statement to Lieutenant [Jeffrey] Wiscott of the Sharon Police Department. In

his statement, [Appellee] admitted to a disagreement between [Appellee] and [A.C.], and further admitted to having sexual intercourse, but attributed the bruising on [A.C.'s] neck to consensual "rough sex."

Also relevant to this Opinion is the relationship between [Appellee] and two prior women; [M.F.] and [C.D.]. Regarding [M.F.], she filed for and received a temporary and permanent restraining order against [Appellee] in 2013 in Morton County, North Dakota. In the sworn petition forming the basis for the restraining order, [M.F.] described several accounts of abuse that occurred during her relationship with [Appellee], stating that [Appellee] had been "hitting her hard on a daily basis." She also explained that she was afraid to leave [Appellee] for fear that he would kill her, and she described several incidents where [Appellee] regularly beat her in the face, dragged her by her hair, hit her very hard, and bragged that he knew how to strike her without leaving marks.

[M.F.] and [Appellee's] abusive relationship culminated in a violent attack inside of [Appellee's] vehicle on May 22, 2013. On that occasion, [Appellee] coaxed [M.F.] to get into a car with him by promising to drive her to a store in town. Instead of taking [M.F.] to the store, [Appellee] turned off onto a country road, began beating her while driving erratically at 90 miles per hour, stating that he was going to take her into the woods and "beat her up then kill [her]," that "no one would hear her scream," and that "no one would find her." [M.F.] escaped by slipping into the back seat, sticking her hand out of the window, and capturing the attention of a passing van. The driver of the van observed [Appellee] continuing to struggle with [M.F.] in the car.

Police responded several minutes later, which caused [Appellee] to cease his attack. [M.F.] filed charges and received the above-mentioned restraining orders. [Appellee] was convicted of Menacing, a Class A Misdemeanor, and Reckless Driving, a Class B Misdemeanor, in Morton County, North Dakota. During the course of the investigation, the Facebook account of [Appellee] was obtained, and it revealed that [Appellee] joined a group on Facebook called[, "]Physiognomy," which is the study or art of identifying the personality and inner-character traits of another, simply by examining the physical features of a person's face.

Regarding [C.D., C.D.] knew [Appellee] for four months before she began dating him on March 8, 2014. Shortly into the relationship, on March 13, 2014, there was a dialogue exchanged on Facebook Instant Messenger where [Appellee] and [C.D.] got into an argument because [Appellee] claimed that he was going to "re-wire [C.D.] for the better" because "he had the power." [Appellee] also sent numerous messages during this exchange where he insulted [C.D.'s] intelligence and professed that [Appellee] is a genius who has a close connection with God. During the messages, [C.D.] (similar to [A.C.]) goes on to tell [Appellee] that she loves him and that she cares for him, trying to resolve the argument.

On April 10, 2014, [Appellee] and [C.D.] went swing dancing in Ohio. On the drive home, [C.D.] was driving and [Appellee] was sitting in the front passenger seat. [Appellee] began to display jealousy over the men that [C.D.] danced with while swing dancing. [Appellee] then began to verbally berate [C.D.], calling her a "whore," "slut," and "bitch," and [Appellee] threatened to ruin [C.D.'s] reputation by telling everyone [C.D.] knew that she was a "whore." [Appellee] then grabbed the steering wheel of the vehicle and attempted to steer the car off the road and into the woods. [C.D.] was [able] to apply the brakes to avoid any collision. After the car came to a stop, [Appellee] slammed [C.D.'s] head against the window of the vehicle, and grabbed [C.D.'s] knife, which she kept on her person for protection. [C.D.] eventually disarmed [Appellee], did not call the police, and ultimately continued her relationship with [Appellee].

On the drive home, [C.D.] used her cell phone to record the conversation immediately after the assault, wherein [Appellee] and [C.D.] discussed the event, and [Appellee] made several concessions that he had hurt [C.D.]. The incident was also discussed via text messages the following day, wherein [Appellee] made reference to the incident by telling [C.D.] that he "was poisoned" and "a snake made him do it." On the same day on Facebook Instant Messenger, [Appellee] further expressed to [C.D.] that "this has been the saddest day of my life." Ultimately, as a result of the incident, [C.D.] made a medical appointment with a chiropractor because her rib became dislocated during her struggle with [Appellee].

Over the next month, there were approximately six or seven occasions between April 10, 2014 and May 9, 2014, where [Appellee] would lock [C.D.] in his room, refuse to let her leave, take away her keys and phone, and even barricade the door. When this occurred, [Appellee] would physically abuse [C.D.] by punching her; slapping her; choking her; refusing her food and water; drugging her; threatening to kill her, her sister, and family; threatening to burn down her house; and otherwise refusing to let her leave until she had sexual intercourse with him. There were also instances where [Appellee] would drag [C.D.] by her hair while he was physically assaulting her, and [Appellee] claimed to put spyware in [C.D.'s] computer and a GPS tracker on her phone so that he could "watch her" and "keep track of her." Similar to the situation with [A.C.], if [C.D.] had to use the bathroom, [Appellee] would accompany her.

As a result of [Appellee's] constant abuse, [C.D.] was in fear for her safety if she refused [Appellee's] request for sex. She received a temporary and permanent Protection from Abuse Order against [Appellee] in Mercer County, Pennsylvania. This Order was violated twice by [Appellee]: once when he compelled [A.C.] to contact [C.D.] on [Appellee's] behalf around November 15, 2015, and once when [Appellee] called [C.D.'s] place of work over 50 times in a day. The calling incident also led to a Harassment conviction for [Appellee]. As a result of [A.C.] communicating with [C.D.] in November of 2014, [A.C.] learned of the prior instances of abuse between [Appellee] and [C.D.], including the fact that [Appellee] had locked [C.D.] in his apartment at times.

Rule 1925 Opinion, 11/13/15, at 2–8 (footnote omitted).

On June 26, 2015, Appellee filed a motion *in limine* "for Exclusion of Evidence at Jury Trial," which the trial court granted in part and denied in part on July 31, 2015. Also on June 26, 2015, Appellee filed a motion "to Offer Evidence of the Complainant's Past Consensual Sexual Conduct and Non-Sexual Conduct with Defendant," which the trial court granted on July 6, 2015. Neither of these orders is involved in this appeal.

The Commonwealth on June 26, 2015, filed a Motion and Intent to Introduce Evidence of Other Crimes Pursuant to Pa.R.E. 404(b)(2) ("Rule 404(b) Motion"). In pertinent part, that motion stated as follows:

97. In the instant case, the Commonwealth is seeking to use the following prior bad acts of [Appellee] to show a common plan scheme and design, intent and knowledge of criminal wrongdoing, and the chain or sequence of events showing the complete history of the case:

(a) Testimony and supporting evidence from [C.D.] describing verbal, physical, and sexual abuse she encountered at the hands of [Appellee] during their two-month relationship. Supporting evidence includes:

i. Facebook Instant Messenger correspondence and text message correspondence between [C.D.] and [Appellee] between March, 2014 and May, 2014.

ii. An audio recording of a conversation between [C.D.] and [Appellee] on April 11, 2014, in the state of Ohio.

[iii.] Medical records from [C.D.'s] chiropractor reflecting dates of appointments wherein she had her rib treated, which corresponds with dates of physical abuse: April 11, 2014 and April 22, 2014.

(b) A certified copy of [C.D.'s] Protection From Abuse Order granted on May 20, 2014.

(c) Certified copies of [Appellee's] two violations of [C.D.'s] Protection From Abuse Order, which reflect convictions on August 13, 2014 and March 26, 2015.

(d) A certified copy of [M.F.'s] Temporary Disorderly Conduct Restraining Order granted in Morton County, North Dakota, on May 24, 2013, and a photographed copy taken by [C.D.].

(e) A certified copy of [M.F.'s] Permanent Disorderly Conduct Restraining Order granted in Morton County, North Dakota, on June 3, 2013.

(f) A certified copy of the sworn petition and contents therein drafted by [M.F.] on May 24, 2013, used to obtain her restraining order, and the photographed copy taken by [C.D.].

(g) A certified copy of [Appellee's] Menacing and Reckless Driving conviction from July 1, 2013.

(h) A certified copy of [A.C.'s] Protection From Abuse Order granted on December 16, 2014.

(i) A certified copy of [Appellee's] violation of [A.C.'s] Protection From Abuse order, reflecting a conviction on January 14, 2015.

(j) A certified copy of [Appellee's] Harassment conviction from October 14, 2014.

Rule 404(b) Motion, 6/26/15, at 22–23 (footnote omitted).

On July 31, 2015, the trial court granted the Commonwealth's Rule 404(b) Motion in part and denied it in part ("Commonwealth's July 31, 2015 Order"). Specifically, the trial court denied admission of certified copies of multiple orders against Appellee that were obtained pursuant to the

Protection from Abuse ("PFA") Act, 23 Pa.C.S. §§ 6101–6122 ("PFA Act"),[4]

and certified copies of Appellee's violations of those PFA orders, while

permitting witness testimony about the bases of the PFA orders.

Commonwealth's July 31, 2015 Order. The trial court's order stated in full,

as follows:

> AND NOW, this 31st day of July, 2015, upon consideration of the Commonwealth's Motion and Notice of Intent to Introduce Evidence of Other Crimes Pursuant to Pa.R.E. 404(b)(2), IT IS HEREBY ORDERED AS FOLLOWS:
>
> 1) Regarding the testimony and supporting evidence from [C.D.] describing verbal, physical, and sexual abuse she encountered at the hands of [Appellee], the Commonwealth's motion is GRANTED. The Commonwealth may introduce the evidence listed in paragraphs 97(a)(i) through 97(a)(iii) of the aforementioned motion.
>
> 2) Regarding the certified copy of [C.D.'s] Protection from Abuse Order granted on May 20, 2014, as well as certified copies of [Appellee's] two violations of [C.D.'s] Protection from Abuse Order, the Commonwealth's motion is DENIED.
>
> 3) Regarding a certified copy of [M.F.'s] Temporary Disorderly Conduct Restraining Order, the certified copy of [M.F.'s] Permanent Disorderly Conduct Restraining Order, and a certified copy of the sworn petition and contents therein drafted by [M.F.], all relating to incidents happening in North Dakota in May

_____

[4] The purpose of the PFA Act is to protect victims of domestic violence from the perpetrators of that abuse. **Commonwealth v. Ferko-Fox v. Fox**, 68 A.3d 917, 921 (Pa. Super. 2013).

of 2013, the Commonwealth's motion is DENIED.

4) Regarding a certified copy of [Appellee's] Menacing and Reckless Driving conviction from July 1, 2013 in Ohio, the Commonwealth's motion is DENIED.

5) Regarding a certified copy of [A.C.'s] Protection from Abuse Order, granted December 16, 2014, as well as a certified copy of [Appellee's] violation of this Order, reflecting a conviction on January 14, 2015, the Commonwealth's motion is DENIED.

6) Regarding a certified copy of [Appellee's] Harassment conviction from October 14, 2014, the Commonwealth's motion is DENIED.

Commonwealth's July 31, 2015 Order, at unnumbered 1–2.

For purposes of clarity, we summarize the effect of that order:

• **Regarding A.C.**, the victim in this case, the trial court denied:

o A certified copy of her PFA order against Appellee and Appellee's violation of that order.

• **Regarding C.D.**:

o The trial court denied:

▪ A certified copy of her PFA order against Appellee;

▪ Copies of Appellee's two violations of that order;

▪ Appellee's past convictions for Menacing and Reckless Driving from July 1, 2013 in Ohio;

▪ Appellee's past conviction for Harassment from October 14, 2014.

o The trial court permitted:

- 11 -

- ▪ Testimony from C.D.;

- ▪ Facebook and text messages between C.D., A.C., and Appellee;

- ▪ An audio recording of a conversation between C.D. and Appellee;

- ▪ C.D.'s medical records from a chiropractor appointment following an altercation between C.D. and Appellee.

- • **Regarding M.F.**, the trial court denied:

  o Admission of certified copies of two restraining orders against Appellee;

  o A certified copy of a petition by M.F. in support of those orders.

On August 18, 2015, the trial court filed an opinion.

On August 27, 2015, the Commonwealth filed a "Motion to Reconsider Court's Order Dated July 31, 2015 and Opinion in Support of Order." In response, on August 31, 2015, the trial court granted reconsideration and revoked the Commonwealth's July 31, 2015 Order. Order, 8/31/15. On September 10, 2015, the trial court reinstated the Commonwealth's July 31, 2015 Order *verbatim*, and it is from that order that the Commonwealth appeals and Appellee purports to cross-appeal. Order, 9/10/15. The Commonwealth timely filed a notice of appeal on September 25, 2015. On October 8, 2015, Appellee filed a cross-appeal from the September 10, 2015 order.

In its brief, the Commonwealth raises the following issues for our review:[5]

1. Whether a certified copy of a PFA order and a certified [copy] of a violation thereof, sought and obtained by [A.C.], was properly admissible pursuant to Pa.R.E. 404(b)?

2. Whether a certified copy of a Protection From Abuse (PFA) Order and certified copies of two violations thereof, sought and obtained by [C.D.], and/or testimony relating to the PFA Order and violations, was properly admissible pursuant to Pa.R.E. 404(b)?

3. Whether certified copies of Restraining Orders sought and obtained against [Appellee] by [M.F.], and a certified copy of the petition and contents that served as the basis for those Orders, was properly admissible pursuant to Pa.R.E. 404(b), and as an exception to the hearsay rule?

Commonwealth's Brief at 5. In his brief, Appellee responds to the Commonwealth's issues and raises the following single issue in his cross-appeal:

Whether the trial court abused its discretion in failing to exclude from trial evidence of alleged bad acts of Appellee allegedly made against a different complainant because there was no common scheme or plan established and the evidence of bad acts was improper character evidence which was unfairly prejudicial to Appellee's presumption of innocence at trial?

Appellee's Brief at 6.

Our standard of review of the denial or grant of a motion *in limine* is well settled:

_____

[5] We have renumbered the issues set forth in the Commonwealth's brief to comport with the order that the Commonwealth addresses them in its argument.

- 13 -

When ruling on a trial court's decision to grant or deny a *motion in limine*, we apply an evidentiary abuse of discretion standard of review. The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous.

**Commonwealth v. Minich**, 4 A.3d 1063, 1068 (Pa. Super. 2010).

As noted, the Commonwealth assails the exclusions from evidence as described in the trial court's September 10, 2015 order. We first address whether the trial court erred or abused its discretion in denying the Commonwealth's presentation of certified copies of both A.C.'s PFA order against Appellee and his violation of that order. In ruling on the Commonwealth's motion *in limine*, the trial court considered Pa.R.E. 403 and 404. Those rules provide as follows:

### Rule 403. Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons

The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Pa.R.E. 403. Pa.R.E. 404(b) provides, in pertinent part:

### Rule 404. Character Evidence; Crimes or Other Acts

\* \* \*

**(b) Crimes, Wrongs or Other Acts.**

(1) *Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show

- 14 -

that on a particular occasion the person acted in accordance with the character.

(2) *Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

(3) *Notice in a Criminal Case.* In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial.

Pa.R.E. 404(b)(1–3).

The Commonwealth argues that the certified copies of A.C.'s PFA order and Appellee's subsequent violation thereof should be admitted under the *res gestae* exception to Pa.R.E. 404(b) and to show Appellee's consciousness of guilt. Commonwealth's Brief at 12. The trial court denied admission of the PFA order and its violation by Appellee but acquiesced in permitting the Commonwealth to establish their factual bases through witness testimony. Rule 1925 Opinion, 11/13/15, at 13–14.

The Commonwealth asserts that there is no case law supporting the trial court's decision to preclude the actual orders and maintains that Pa.R.E. 404(b) jurisprudence should apply to permit their admission. Commonwealth's Brief at 12. Appellee responds that the trial court properly concluded that the prejudicial effect of the PFA order and the PFA-violation order outweighed their probative value. Appellee's Brief at 12.

While evidence of prior bad acts is not admissible to show criminal propensity, evidence of other crimes may be admissible if it is relevant to show some other legitimate purpose. ***Commonwealth v. Tyson***, 119 A.3d 353, 358 (Pa. Super. 2015). An exception to Rule 404(b) exists that permits the admission of evidence where it became part of the history of the case and formed part of the natural development of facts. ***Commonwealth v. Solano***, 129 A.3d 1156, 1178 (Pa. 2015). This exception is commonly referred to as the *res gestae* exception. ***Id.*** Where evidence of prior bad acts is admitted, the defendant is entitled to a jury instruction that the evidence is admissible only for a limited purpose. ***Id.*** (quoting ***Commonwealth v. Hutchinson***, 811 A.2d 556, 561 (2002)).

Evidence of prior bad acts may also be introduced to prove consciousness of guilt, *i.e.*, that the defendant was aware of his wrongdoing. ***Commonwealth v. Pestinikas***, 617 A.2d 1339, 1348 (Pa. Super. 1992). Our Supreme Court has stated that PFA petitions are admissible and relevant to demonstrate the continual nature of abuse and to show the defendant's motive, malice, intent, and ill-will toward the victim. ***Commonwealth v. Drumheller***, 808 A.2d 893, 905 (Pa. 2002).

In support of its argument that copies of A.C.'s PFA order and Appellee's violation thereof are admissible to prove Appellee's consciousness of guilt, the Commonwealth relies upon ***Commonwealth v. Flamer***, 53 A.3d 82 (Pa. Super. 2012). Commonwealth's Brief at 13. In ***Flamer***, the

defendant was arrested for murder, and the prosecution intended to call a witness who was aware of the defendant's murder plot. *Flamer*, 53 A.3d at 84. The witness was killed three months before the start of trial, and the prosecution successfully sought to introduce evidence that the defendant conspired with a third party to kill the witness. *Id.* at 86. This evidence was admitted to show the history of the case and to prove the guilty conscience of the defendant. *Id.* at 87. Herein, the Commonwealth avers that "[i]f evidence of a defendant's having conspired to kill a key witness against him in a different murder case is admissible to prove consciousness of guilt, then . . . [Appellee's] violation of a PFA order in an attempt to persuade A.C. not to pursue the charges against him should also be admissible." Commonwealth's Brief at 19.

We agree with the Commonwealth that A.C.'s PFA order against Appellee is admissible. As the victim in this case, A.C.'s PFA order against Appellee is important to establish the history of A.C.'s relationship with Appellee and to show that Appellee was aware of his guilt. We concur with the Commonwealth that there is a dearth of legal precedent that permits testimony regarding a PFA order and its violation but simultaneously excludes the actual PFA order and its violation. Significantly, Appellee has not cited any case law in support of the trial court's decision. Evidence of prior abuse between a defendant and an abused victim is generally

admissible to establish motive, intent, malice, or ill-will.  *Commonwealth v. Jackson*, 900 A.2d 936, 940 (Pa. Super. 2006).

We also agree with the Commonwealth that the probative value of A.C.'s PFA order and evidence of its violation outweighed any prejudicial effect to Appellee.  Our Supreme Court has reiterated that "the trial court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged."  *Commonwealth v. Hairston*, 84 A.3d 657, 666 (Pa. 2014) (quoting *Commonwealth v. Lark*, 543 A.2d 491, 501 (Pa. 1988)).

We observe that all evidence of prior bad acts typically is prejudicial.  In this case, however, it is not unduly so.  Our review of the record reveals that A.C. was expected to testify about the horrific night on November 18, 2014, when Appellee locked her in his bedroom, forced her to have sex, and choked and physically assaulted her.  Rule 1925 Opinion, 11/13/15, at 3–4.  The next day, A.C. reported Appellee's assault to the police.  *Id.* at 4.  Shortly thereafter, A.C. sought a PFA order against Appellee, and the trial court granted it on December 16, 2014.  Rule 404(b) Motion, 6/26/15, at 9.

After engaging a third party to instruct A.C. to withdraw the criminal charges she filed against him and/or refuse to appear at the preliminary hearing, Appellee was convicted of violating the December 16, 2014 PFA

order on January 14, 2015. *Id.* The trial court readily asserted that this evidence "could have been admissible under the theories advanced by the Commonwealth" but excluded it for being unfairly prejudicial. Rule 1925 Opinion, 11/13/15, at 9. The trial court wholly failed to substantiate this finding. The Commonwealth asserts, and we agree, that it is necessary for the jury to know exactly what that PFA order stated and the nature of Appellee's violation. Commonwealth's Brief at 19. Similar to *Flamer*, both acts prove the same state of mind: that both defendants were conscious of their guilt. The trial court's failure to substantiate its finding of unfair prejudice compels our conclusion that its order should be reversed.

Next, we address the Commonwealth's second and third arguments in tandem. The Commonwealth contends that the trial court erred in excluding certified copies of 1) C.D.'s PFA order against Appellee and its subsequent violation, and 2) M.F.'s restraining orders against Appellee and a sworn petition by M.F. Commonwealth's Brief at 20. Most significantly, the Commonwealth maintains that these documents should be permitted by the common-plan-scheme-and-design exception to Rule 404(b), as well as to prove forcible compulsion. Commonwealth's Brief at 21, 23. The Commonwealth contends, and we agree, that this evidence is especially necessary to corroborate the victim's allegations in a case involving sexual assault, prove similarities between the cases, and to rebut Appellee's

contention that his sexual assault of A.C. actually was consensual sex. Commonwealth's Brief at 26.

The Commonwealth also avers that C.D.'s PFA order and its violation as well as M.F.'s restraining orders should be admitted to establish the history of the instant case. The Commonwealth posits that these orders are necessary to establish the history of the case because Appellee directed A.C. to contact C.D., in violation of C.D.'s PFA order against Appellee. Rule 404(b) Motion, 6/26/15, at 2. Appellee responds that the orders have no probative value and merely show Appellee's bad characteristics. Appellee's Brief at 15.

Evidence of prior bad acts may be admitted to establish the "existence of a common scheme, [establish] an individual's motive, intent, or plan, or [identify] a criminal defendant as the perpetrator of the offense charged." ***Commonwealth v. Arrington***, 86 A.3d 831, 842 (Pa. 2014). Two conditions must be satisfied to admit prior-crimes evidence to establish a common scheme: (1) the probative value of the evidence must outweigh its potential for prejudice against the defendant and (2) "a comparison of the crimes must establish a logical connection between them." ***Id.*** (quoting ***Commonwealth v. Miller***, 664 A.2d 1310, 1318 (Pa. 1995)).

The Commonwealth relies on ***Commonwealth v. Elliot***, 700 A.2d 1243 (Pa. 1997), to support its assertion that the evidence of prior bad acts is necessary to prove "significant similarities" among C.D., M.F., A.C., and

Appellee's actions.  Commonwealth's Brief at 26.  In **Elliot**, the defendant was convicted of murdering a young female in an acquaintance's apartment after sexually assaulting her.  **Elliot**, 700 A.2d at 1246.  At the defendant's trial, the prosecution called three prior victims to testify that the defendant had attacked them around the same time on different evenings, when leaving the same club, and he had assaulted them with similar acts of violence and sexual assault.  **Id.** at 1247.  The defendant appealed, claiming that the trial court abused its discretion by improperly admitting this evidence.  **Id.** at 1250.  Our Supreme Court held that evidence of the defendant's past sexual assaults was admissible and that the evidence was more probative than prejudicial.  **Id.**

In the instant case, the trial court excluded the evidence relating to C.D. and M.F. for being unfairly prejudicial.  However, it did not substantiate its conclusion or explain its reasoning.  Rule 1925 Opinion, 11/13/15, at 9. The evidence of prior bad acts in this case "did not seek to inflame the jury's sensibilities with references to matters other than the legal proposition relevant to the case."  **Commonwealth v. Antidormi**, 84 A.3d 736, 751 (Pa. Super. 2014).  Rather, the Commonwealth's evidence sought directly to "complete the story of the crime on trial by proving its immediate context of happenings near in time and place."  **Commonwealth v. Brown**, 52 A.3d 320, 326 (Pa. Super. 2012).

Most convincingly, the excluded evidence is admissible under the common-plan-scheme-or-design exception to Rule 404(b). The trial court admitted that the evidence in the case displayed a **strong** common plan, scheme, and design, as evidenced by the following:

> The Commonwealth correctly argued in its Motion that there is a common scheme, plan, or design in [Appellee's] actions/methodology. There are many similarities between the incidents of abuse among [M.F., C.D., and A.C.], the current victim. These similarities include the following facts: all the victims were Caucasian, natural brunettes in their twenties or early thirties; [Appellee] began breaking each woman down in the relationship via verbal assaults and the degradation of the victims' intelligence; [Appellee] displayed extreme jealousy towards [A.C.'s and C.D.'s] former boyfriends, which was often a triggering point for physical violence; [Appellee] displayed controlling behavior by recording the victims and taking over their phones; [Appellee's] interest in Physiognomy, where he trained himself to identify submissive victims; the way [Appellee] isolated the victims and performed similar physical assaults on them (including pulling their long hair); [Appellee's] invasion of the victims' privacy for guarding them as they used the restroom; and the similar responses of the abuse by [A.C. and C.D.] (in apologizing to [Appellee] and trying to work things out), along with [Appellee's] statement that the two are very alike. When these facts are viewed in totality, as this Court was required to do in deciding the Commonwealth's [m]otion, it was evident that there is a **strong** plan and design in [Appellee's] predatory actions and that he tends to abuse similar victims in similar ways.

Rule 1925 Opinion, 11/13/15, at 13 (emphasis added). ***Compare Commonwealth v. O'Brien***, 836 A.2d 966 (Pa. Super. 2003 (two prior sexual assaults on minor boys admissible under common-scheme-or-plan exception in trial relating to assault on third minor boy); and ***Commonwealth v. Aikens***, 990 A.2d 1181 (Pa. Super. 2010) (fact pattern

of prior assault was markedly similar such that evidence was admissible under common-scheme-design-or-plan exception and probative value of evidence outweighed its prejudicial impact).

In the instant case, while the trial court permitted testimony **about and supporting** the PFA and restraining orders, it concluded that their introduction would "serve merely to convince the jury that judges have found [Appellee] to be a 'bad guy.'" Rule 1925 Opinion, 11/13/15, at 14. The trial court erred. While finding that the testimony about Appellee's actions against C.D. and M.F. provide "sufficient evidence to establish the common scheme, plan, or design of [Appellee's] prior bad acts," *id.* at 15, the trial court concluded that "the orders themselves could not be introduced due to the risk of excessive prejudice to [Appellee]." *Id.* Once again, because the trial court entirely failed to substantiate this conclusion in any manner, it cannot be sustained.[6]

Appellee has filed a cross-appeal from that part of the September 10, 2015 order that permitted evidence of C.D.'s PFA order and M.F.'s

_____

[6] The Commonwealth has withdrawn its contention regarding the trial court's denial of M.F.'s sworn petition. Commonwealth's Brief at 34. In addition, the Commonwealth has not asserted any argument regarding the trial court's denial of Appellee's menacing-and-reckless-driving conviction in North Dakota [mislabeled Ohio by the trial court] dated July 1, 2013, or Appellee's harassment conviction of October 14, 2014, in its statement of questions. Thus, those issues are waived. **Commonwealth v. Samuel**, 102 A.3d 1001, 1003–1004 (Pa. Super. 2014) (failure to raise issue in statement of questions involved on appeal waives issue) (citing Pa.R.A.P. 2116(a)).

restraining orders against Appellee. Before addressing Appellee's issue in his cross-appeal, however, we must determine whether this Court has jurisdiction. The "authority of an appellate court to conduct review of a pre-trial order is a jurisdictional matter." ***Commonwealth v. Jones***, 826 A.2d 900, 903 (Pa. Super. 2003) (*en banc*) (citing ***Commonwealth v. Rosario***, 615 A.2d 740, 742 (Pa. Super. 1992)). This Court may consider the issue of jurisdiction *sua sponte*. ***Commonwealth v. Yarris***, 731 A.2d 581, 587 (Pa. 1999).

Appellee, in his statement of jurisdiction in his brief, asserts that jurisdiction "is conferred on the Superior Court by Pa.R.A.P. 511 (relating to Cross Appeals) and Pa.R.A.P. 513 (relating to Consolidation of Multiples Appeals)." Appellee's Brief at 1–2. Rule 511, however, merely governs the time for taking a cross-appeal, not the jurisdictional basis for filing one. Rule 513 speaks only to the appellate court's discretion to order appeals from the same order to be argued together.

Procedurally, for our purposes here, motions to suppress and *in limine* are described as being essentially the same, as both may preclude Commonwealth evidence and prevent the Commonwealth from prosecuting its case. ***See***, ***e.g.***, ***Jones***, 826 A.2d at 903–907. Thus, in evaluating this Court's jurisdiction to entertain the cross-appeal, we find guidance from case law involving appeals from pretrial orders that denied and/or granted admission of evidence, whether by suppression or by virtue of Pa.R.E. 404.

*See Commonwealth v. Padilla*, 923 A.2d 1189, 1193–1194 (Pa. Super. 2007) (citing *Commonwealth v. Noll*, 662 A.2d 1123, 1125 (Pa. Super. 1995) ("For purposes of appealability, the [trial] court's ruling on a motion *in limine* is exactly the same as a pre-trial suppression order.")).

Instantly, the trial court's September 10, 2015 order is not a final order because it did not dispose of all claims and all parties. Pa.R.A.P. 341 (b)(1). As noted *supra*, while the September 10, 2015 order is interlocutory and does not end the entire case, **the Commonwealth** can appeal as of right because it has certified that the order substantially handicapped its prosecution. *Whitlock*, 69 A.3d at 636 n.2; Pa.R.A.P. 311(d) (in a criminal case "the **Commonwealth** may take an appeal as of right from an order that does not end the entire case where [it] certifies in the notice of appeal that the order will terminate or substantially handicap **the prosecution**) (emphases added). By its language, this rule is applicable only to the Commonwealth's right to take an interlocutory appeal in the circumstances defined.

Appellee's cross-appeal, however, is another matter. "The general rule in criminal cases is that a defendant may appeal only from a final judgment of sentence, and an appeal from any prior order or judgment will be quashed." *Commonwealth v. McMurren*, 945 A.2d 194, 195 (Pa. Super. 2008) (quoting *Commonwealth v. Scott*, 578 A.2d 933, 941 (Pa. Super. 1990)). "In this Commonwealth, an appeal may only be taken from: 1) a

final order or one certified by the trial court as final; 2) an interlocutory order as of right; 3) an interlocutory order by permission; or 4) a collateral order." ***Commonwealth v. Brister***, 16 A.3d 530, 533 (Pa. Super. 2011). We have already concluded that Appellee cannot satisfy the first and second categories of appeals: the order appealed is not final, and Appellee, unlike the Commonwealth, does not meet the requirements of Pa.R.A.P. 311. Regarding the third category, an interlocutory appeal by permission, the trial court never certified the order nor did Appellee file a petition seeking permission to appeal. "Absent both jurisdictional prerequisites, we may not grant [Appellee] permission to appeal." ***Id***. at 535. The final category, that the September 10, 2015 order was appealable by Appellee as a collateral order, likewise is not met. Pa.R.A.P. 313. "A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." Pa.R.A.P. 313(b). In this situation, **if** Appellee ultimately is convicted, the trial court's decision to admit the evidence can be reviewed through Appellee's right to a direct appeal; thus, the claim will not be lost. ***Contra Commonwealth v. Minich***, 4 A.3d 1063, 1068 (Pa. Super. 2010) (review of trial court's order denying the Commonwealth's Pa.R.E. 404(b) motion to preclude introduction of **defense** evidence would be irreparably lost in the event of an acquittal because "constitutional

prohibition against double jeopardy protects against a second prosecution for the same offense after an acquittal").

We find additional guidance in **Commonwealth v. Slaton**, 556 A.2d 1343 (Pa. Super. 1989) (*en banc*).  While there were three concurring and dissenting opinions in that case, this Court was unanimous in its decision to quash the defendant's cross-appeal, where the Commonwealth filed an appeal from a pretrial order granting in part and denying in part the defendant's motion to suppress evidence.  The **Slaton** Court examined relevant precedent related to the Commonwealth's and a defendant's appeals of pretrial orders.  For example, in **Commonwealth v. Bosurgi**, 190 A.2d 304 (Pa. 1963), our Supreme Court commented on the Commonwealth's versus a defendant's right to appeal a pretrial suppression ruling and stated:

> The right of appeal by a defendant stands upon an entirely different footing.  The denial of a defendant's motion for the suppression of evidence does not deprive a defendant of an appellate review of the validity of that order.  At trial, the defendant still has full opportunity to object to the introduction into evidence of the allegedly improper evidence and, in the event of his conviction, he will then have an opportunity to secure an appellate evaluation of the propriety and admissibility of such evidence.  Therefore, unlike the Commonwealth, an adverse pretrial disposition of a motion to suppress evidence does not deprive the defendant of his only opportunity for appellate review.  Under such circumstances, the element of finality, which is the basis of appealability, is lacking in an order denying suppression and the defendant should have no right of appeal from such order.

*Id*. at 308–309. The **Slaton** Court also looked to **Commonwealth v. Fisher**, 221 A.2d 115 (Pa. 1966), where our Supreme Court addressed the issue of cross-appeals by criminal defendants when the Commonwealth appealed part of the trial court's disposition of a motion to suppress. The **Fisher** Court held that a "defendant in a criminal case may not appeal from a pretrial order denying his motion for the suppression of evidence." **Id**. at 116 (citing **Bosurgi**, 190 A.2d 304). Ultimately, on this issue, **Slaton** concluded as follows:

> In light of the long-standing rule of American jurisprudence that, except in extraordinary circumstances, an appeal may be taken only from a final order of the court, and in recognition of our responsibility to preserve the sanctity of the appellate process, we hold that a criminal defendant may not appeal from an order of a suppression court **even in the posture of a cross-appeal**.

**Slaton**, at 1352–1353, *affirmed*, 608 A.2d 5 (Pa. 1992).

Furthermore, in **Commonwealth v. Strong**, 825 A.2d 658 (Pa. Super. 2003), this Court addressed the defendant's appeal from, *inter alia*, pretrial orders that admitted evidence of the defendant's prior bad act. In concluding that the issue was not properly before us, we noted that the trial court's pretrial order denying the defendant's motion to preclude prior crimes evidence was interlocutory and not appealable, "as it did not dispose of all claims and all parties." **Id**. at 667 (citing Pa.R.A.P. 341(b)(2)). We explained that "[a]n interlocutory order, not appealable as of right under Pa.R.A.P. 311, may be appealed only with permission of court," *id*. at 668,

and Strong's "only recourse would have been to petition for permission to appeal pursuant to Pa.R.A.P. 1311, which he failed to do." *Id*. at 667 n.3. Thus, we conclude that we lack jurisdiction to consider Appellee's cross-appeal of that portion of the September 10, 2015 order that permitted evidence of C.D.'s PFA order and M.F.'s restraining orders against Appellee.

For the foregoing reasons, we reverse that portion of the September 10, 2015 order excluding a certified copy of C.D.'s PFA order granted May 20, 2014, certified copies of Appellee's two violations of that order, certified copies of M.F.'s temporary and permanent restraining orders, a certified copy of A.C.'s PFA order granted December 16, 2014, and a certified copy of Appellee's violation of that order. We quash Appellee's cross-appeal. We remand this matter to the common pleas court so that the case may proceed.

Order reversed in part; cross-appeal quashed; case remanded. Jurisdiction is relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/19/2016